IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

AMERICAN DAIRY QUEEN
CORPORATION,

                Plaintiff and Counter Defendant,

v.

UNIVERSAL INVESTMENT
CORPORATION,

                Defendant and Counter Claimant.

OPINION AND ORDER

16-cv-323-wmc

---

In this civil action, plaintiff American Dairy Queen Corporation ("ADQ") seeks a declaratory judgment that it properly terminated the relationship with the defendant Universal Investment Corporation under the provisions of the Wisconsin Fair Dealership Law, Wis. Stat. § 135.01 *et seq.* ("WFDL"), that Universal violated the Lanham Act, 15 U.S.C. §§ 1141, 1125(a)(1), by using the DAIRY QUEEN® trademark without maintaining brand standards. For its part, Universal asserts counterclaims against ADQ for tortiously interfering with a prospective contract to purchase DAIRY QUEEN® territory rights in Eau Claire County, Wisconsin, as well as violations of the WFDL. Although the WFDL would appear to dictate the ultimate outcome of this lawsuit, pending before the court are: (1) Universal's motion for partial summary judgment on ADQ's Lanham Act claim as barred by the doctrine of laches (dkt. #31); and (2) ADQ's motion for summary judgment on Universal's tortious interference counterclaim based on privilege and justified interference with the transfer of territory rights (dkt. #43). For the reasons that follow, the court will grant in part and reserve in part Universal's motion, finding that

laches bars a Lanham Act claim premised on pre-October 2015 trademark violations, while also finding that material issues of fact concerning ADQ's WFDL claim precludes summary judgment after that date. For similar reasons, the court will enter judgment in ADQ's favor on Universal's tortious interference claim, finding that this defense applies here.

UNDISPUTED FACTS[1]

### A. Background

American Dairy Queen Corporation ("ADQ") is the franchisor and owner of the DAIRY QUEEN® franchise system. ADQ licenses its trademarks to third parties who operate and/or sublicense restaurants under that name. There are currently 6,700 DAIRY QUEEN® restaurants operating in the United States and abroad, including 132 in Wisconsin.

Historically, ADQ has licensed franchisees in two ways: (1) through "territory operators" who take the responsibility for issuing sublicenses to individual stores in a specified territory and for supervising the stores; and (2) through licensees that contract directly with ADQ to operate stores who are supervised directly by ADQ. The second approach is now ADQ's preferred business model. Indeed, ADQ has not entered into an agreement with a new territory operator for more than twenty-five years.

Universal Investment Corporation operates a restaurant in Eau Claire, Wisconsin, on Menomonie Street under the DAIRY QUEEN® name and sells soft serve treat products

---

[1] Unless noted otherwise, the following facts are material and undisputed for purposes of summary judgment consistent with the parties' submissions and viewing the facts and inferences in the light most favorable to the non-moving party.

using the DAIRY QUEEN® trademark. John and Maureen (also known as "M.M.")[2] Robertson are husband and wife, and they remain the sole owners of Universal. John Robertson began working in the first Dairy Queen in Eau Claire County while in high school. In 1973, he entered into an agreement with the former territory operators, Walter and Opal Stephen, to operate that Dairy Queen location himself. Initially in their own names and more recently as the sole owners of Universal, the Robertsons have operated that Menomonie Street DQ for more than forty years.

While not a party to this action, Stephen Partnership, a Wisconsin general partnership, located in Eau Claire, Wisconsin, is central to the parties' dispute. Stephen Partnership is the successor in interest to Walter and Opal Stephens, and it is a former ADQ licensee and territory operator for Eau Claire County, Wisconsin. The Robertsons (and later Universal) have continued to maintain the same basic sublicense arrangement with Stephen Partnership for the Menomonie Street DQ that began with the Stephens in 1973.

## B. History of Territory Agreements Between ADQ and Stephen Partnership

Similarly, through a series of their own written agreements (referred to generally as "territory agreements") between ADQ and Stephen Partnership (or their respective predecessors), Stephen Partnership maintained its license to operate and sublicense DAIRY

---

[2] Universal also contends that "M.M. Robertson" refers to a joint venture involving Maureen and John Robertson. ADQ disputes this characterization. (Pl.'s Reply to Def.'s PFOFs (dkt. #102) ¶ 5.) The court takes up this issue below, in conjunction with the purported assignment to Universal by M.M. Robertson of any claim for damages resulting from ADQ's alleged interference with the purchase offers.

3

QUEEN® stores that sell DAIRY QUEEN® products in Eau Claire County, Wisconsin, between 1955 and 2014. Lark Sales Company, a predecessor of ADQ, entered into the first of the territory agreements with Walter G. Stephen and Opal R. Stephen, the predecessors of Stephen Partnership, granting a license to operate and sublicense DAIRY QUEEN® restaurants that sell DAIRY QUEEN® soft serve products in Eau Claire County (the "1955 Territory Agreement").[3] (Beck Decl., Ex. A (dkt. #47-1).) ADQ and Opal Stephen entered into a subsequent Food Service Addendum, dated September 16, 1982 (the "1982 Addendum"), for the operation and sublicensing of DAIRY QUEEN® restaurants using the DAIRY QUEEN® BRAZIER® trademarks in Eau Claire County, Wisconsin. (Beck Decl., Ex. B (dkt. #47-2).) At that time, ADQ also licensed the DAIRY QUEEN® BRAZIER® marks in connection with ADQ's food service system and the sale of cooked food products such as hamburgers, hot dogs, french fries and other food products. (*Id.* at App. D.)

Important to the current dispute, the 1982 Addendum included an Appendix G that reflected an agreement between Walter G. and Opal R. Stephen and Burton Myers, made on January 31, 1959, granting the Stephens a license to use the trade name "Dairy Queen" under the "Trade Mark Registrations #4163, 6524, and 6825 as registered with the Department of State for the State of Wisconsin" (the "1959 Agreement"). (*Id.* at App.

---

[3] In response to a number of proposed findings of facts, defendant points out that the evidence cited in support a proposed fact does not establish that ADQ is a successor of Lark Sales. In its reply in support of its proposed findings, plaintiff cites to evidence that ADQ acquired the rights of Lark Sales Company in the 1955 Territory Agreement. (Pl.'s Reply to Pl.'s PFOFs (dkt. #102) ¶ 6 (citing Beck Depo. (dkt. #60) 161-63, 168-71).) Even if not done formally, there is no reasonable dispute that ADQ stepped into Lark Sales' shoes for all material purposes relevant to the dispute between the parties here for the reasons set forth above.

G.)  The 1982 Addendum also affirmed that the 1955 Territory Agreement "shall remain in full force and effect in accordance with its terms," including the subsequent rights as described in Appendix G.  (*Id.* at § 1.7.)  The 1982 Addendum further explained that if there was an inconsistency between the 1982 Addendum and the 1955 Territory Agreement as it related to dairy products, the 1955 Territory Agreement governed.  (*Id.*)[4]

As the territory operator, Stephen Partnership (or its predecessors in interest) had the apparent authority to -- and did -- enter into sublicenses for the operation of DAIRY QUEEN® restaurants in Eau Claire County.  Beginning in 1973, there can be no reasonable dispute that John Robertson initially and Universal most recently relied upon the agreements with the Stephens initially and Stephen Partnership most recently to operate one or more Dairy Queen stores in Eau Claire.  Most notably, in 2000, Universal and Stephen Partnership entered into a sublicense agreement.[5]  Under that sublicensee relationship, Universal had the right to sell soft serve products under ADQ's trademarks, but it did not have the right to sell food offerings under ADQ's trademarks.  Universal could also sell food though that was not packaged with ADQ's trademarks.[6]

---

[4] Universal does not dispute any of these facts, though it notes that the 1982 Addendum also references Appendix G, which includes the 1959 Agreement.

[5] Recently plaintiff filed a motion to file a sur-reply in support of its summary judgment motion, attaching a recently-discovered signed version of the 2000 agreement.  (Dkt. #116.)  Defendant does not oppose the motion itself but does challenge whether the signed version provides support for its laches defense.  (Dkt. #119.)  Accordingly, the court will grant this motion and has considered the signed 2000 sublicense agreement.  (Rotchadl Decl., Ex. 1 (dkt. #117-1).)

[6] ADQ maintains that Universal could only sell a "limited" selection as a "non-system food" store. (Pl.'s Add'l PFOFs (dkt. #100) ¶¶ 38-40, 47.)

### C. Stephen Partnership's Default and 2014 Lawsuit

On February 15, 2013, ADQ issued a Notice of Default to Stephen Partnership for failure to submit monthly store reports and pay monthly royalty and sales promotion fees, along with accrued interest from September through December 2012. (Beck Decl., Ex. C (dkt. #47-3).) The notice also informed Stephen Partnership that it had sixty days from receipt to cure these defaults. On May 8, 2013, ADQ extended this cure period until May 15, 2013, and issued a Notice of Termination, effective August 6, 2013, if Stephen Partnership failed to cure timely. (*Id.*, Ex. D (dkt. #47-4).) Because Stephen Partnership failed to cure, ADQ formally advised on June 7, 2013, that its rights under the 1982 Addendum and 1955 Territory Agreement would terminate effective August 6. (*Id.*, Ex. E (dkt. #47-5).) On September 28, 2013, John Robertson also received a letter from ADQ, which informed Universal that Stephen Partnership's territory rights had been terminated and that Universal was now considered a direct-licensed restaurant with ADQ.

On March 24, 2014, ADQ further filed a lawsuit against Stephen Partnership in the Western District of Wisconsin, seeking a declaratory judgment that it had validly terminated the 1982 Addendum, as well as asserting affirmative claims against the partnership under the Lanham Act for alleged unauthorized use of ADQ's trademarks post-termination and for breach of contract based on unpaid fees under the 1982 Addendum. *Am. Dairy Queen Corp. v. Stephen P'ship*, No. 3:14-cv-00218-wmc (W.D. Wis. Mar. 24, 2014). (*See also* Beck Decl., Ex. H (dkt. #47-8).) The parties to that lawsuit entered into a settlement agreement, which became effective December 1, 2014 (the "Settlement Agreement"). (Beck Decl., Ex. I (dkt. #47-9).) Under the terms of that agreement, all of

Stephen Partnership's "rights, title and interests" under the 1955 Territory Agreement, 1982 Addendum, and Appendix G to the 1982 Addendum (which includes the 1959 Agreement) were "terminated and thereby revert to ADQ." (*Id.* at ¶¶ 7, 9-10.) The Settlement Agreement also provided that Stephen Partnership's rights as a licensor with Universal were transferred to ADQ. (*Id.* at ¶ 8.)

### D. Robertsons' Interest in Acquiring Territory Rights

In January 2014, approximately three months after being advised that ADQ had purportedly terminated Stephen Partnership's territory rights under the agreement and two months before the filing of the lawsuit between ADQ and Stephen Partnership, the Robertsons became interested in acquiring DAIRY QUEEN® territory rights in Eau Claire County. As John Robertson testified at his deposition, he believed the territory "was a valuable commodity to us and [we] were interested in buying it and [Stephen Partnership was] interested in settling it." (J. Robertson Depo. (dkt. #58) 83.) That same month, the Robertsons met with Stephen Partnership's owner, Sandra Stephen-Bailie, to discuss terms of a purchase, including general payment terms for Stephen Partnership's DAIRY QUEEN® territory rights in Eau Claire County.

Over the course of the next couple of months, the Robertsons and Stephen Partnership, through counsel, agreed generally to a $250,000 upfront cash payment, payments of $850 monthly (increasing after six years) and "up to $75,000" in relation to "potential liability" for ADQ's lawsuit. (J. Robertson Depo. (dkt. #58) 85-86.) In May 2014, the parties even exchanged a draft contract to purchase all or a part of Stephen Partnership's DAIRY QUEEN® territory rights in Eau Claire County. That draft contract

was between M.M. Robertson and Stephen Partnership.  Universal was not a party to the prospective contract, though defendant points out that the contract was with "M.M. Robertson, doing business as DAIRY QUEEN OF EAU CLAIRE COUNTY, *or assigns*." (*See, e.g.*, Mirr Decl., Ex. 4 (dkt. #83-4) p.1, Art. 5 (emphasis added).)  Universal also contends that "M.M. Robertson acted as the agent of Universal Investment Corporation in offering to purchase the Stephens Partnership Territory."  (Def.'s Add'l PFOFs (dkt. #80) ¶ 5.)  Still, there is no dispute that the proposed contracts did not specifically name Universal as a party.

On July 9, 2014, the Robertsons and Stephen Partnership circulated what Universal characterizes as the "final" draft of purchase contract, with the goal of signing it two days later on July 11, 2014.[7]  However, the parties did not sign the agreement on that date; to the contrary, the record reflects ongoing changes to the prospective contract.  (Pl.'s Resp. to Def.'s Add'l PFOFs (dkt. #101) ¶ 20.)

Sometime later in July, ADQ apparently became aware of the proposed sale, and alerted Stephen Partnership's counsel that:  (1) ADQ would have to consent to any sale of its territory rights and (2) Stephen Partnership would need to submit the proposed agreement for it to make that determination.  (Stephen-Bailie Depo., Ex. 77 (dkt. #61-2) 18.)  In a July 14, 2014, email to the Robertsons' counsel, counsel for Stephen Partnership

---

[7] At some point, the draft contracts also contemplated forgiveness of two promissory notes owed to Universal by Stephen Partnership.  Universal posits this proposed fact apparently to support its argument that Universal has a stake in a tortious interference with a contract claim asserted against ADQ by M.M. Robertson.  Because the court finds that ADQ's alleged interfering actions were both privileged and justified under Wisconsin law, the court need not wade further into these murky factual waters.

characterized this consent requirement as the "right to veto the transfer." (Mirr Decl., Ex. 7 (dkt. #83-7) 5.) The email also advised that "ADQ would not approve of [the Robertsons] as the Territory Operator." (*Id*.) In response, the Robertsons and Stephen Partnership discussed restructuring the proposed deal to have M.M. Robertson purchase 99 shares of Stephen Partnership, leaving it with one share.[8] However, Stephen Partnership's counsel sent an email to Robertsons' counsel on October 16, 2014, advising that even with this change to the deal, ADQ "will challenge any transfer whereby my client is no longer in control of the territory." (*Id.*, Ex. 8 (dkt. #83-8) 4.)

The Robertsons' negotiations with Stephen Partnership on the prospective contract continued through November 2014, but on December 19, 2014, Stephen Partnership advised the Robertsons in writing that "[u]nfortunately due to the extreme exposure of the ADQ lawsuit, my client has decided to settle the case with ADQ and will not be selling the territorial rights to the Robertsons." (Rotchadl Decl., Ex. C (dkt. #76-3).) As a result, a final agreement between the Robertsons and Stephen Partnership was never reached.

### E. Universal's Direct Licensee Relationship with ADQ

In December 2014, ADQ and Stephen Partnership also jointly informed Universal's counsel that in light of their settlement agreement, Universal was now a direct licensee of ADQ, instead of a sub-licensee of Stephen Partnership. In that letter, Stephen Partnership further acknowledged that ADQ "has all the rights, title, and interests of the franchisor of

---

[8] ADQ challenges whether this change to the proposed deal was to "work around" the consent issue, asserting that it was rather to get around a right of first refusal held by another franchisee (Pl.'s Reply in Support of Pl.'s PFOFs (dkt. #102) ¶ 40), but again this dispute is not material given its valid defenses to plaintiff's counterclaim for tortious interference.

the Dairy Queen® franchise system in Eau Claire County, WI." (Rotchadl Decl., Ex. B (dkt. #46-2).) Finally, ADQ informed Universal in the same joint letter that it could continue to operate pursuant to the license agreement between Universal and Stephen Partnership, September 1, 2000, subject to ADQ's rights as licensor in that agreement.

On January 14, 2015, ADQ sent another letter to John Robertson, reiterating that the Menomonie Street DQ is now a direct-licensed restaurant of ADQ, issuing him a new store number, and notifying him of changes as a result of becoming a direct-licensed franchise of ADQ. (Beck Decl., Ex. J (dkt. #47-10).) In order to develop a transition plan from Universal's prior status as a sublicensee to a direct licensee, to arrange for inspections, and to ensure that Universal conformed with ADQ's system-wide standards, ADQ's Steve Rapuano then made several attempts to contact Universal, including calls on February 4, 12, and 16, an in-store visit on March 3, a letter on March 10, and another in-store visit on June 2. (*See, e.g.*, Beck Decl., Ex. K (dkt. #47-11) (Mar. 20, 2015 letter detailing efforts).)

All of these contacts were consistent with ADQ's preference to have an initial conversation with a franchisee converting from a sublicensed to a direct licensed store in order to introduce them to the process before any inspections begins. Universal does not dispute ADQ's many attempts at contact, but contends that it was seeking to "force" changes to Universal's "long-standing business model and operations in direct contradiction to [Universal's] prior agreement with Stephen Partnership." (Def.'s Resp. to Pl.'s PFOFs (dkt. #65) ¶ 49.)

In June 2015, three people from ADQ then visited Universal's restaurant, but were

denied permission to inspect behind the counter. Universal also does not dispute this encounter, but contends that it, too, was not a "standard" inspection.

Finally, ADQ's counsel spoke with Universal's counsel on the phone on May 21, 2015, and followed up with Universal's counsel in writing on July 2, 2015. (Beck Decl., Ex. D (dkt. #75-4).) The July 2 letter set forth various areas of non-compliance ADQ would no longer tolerate. ADQ requested a meeting with John Robertson within ten business days. Apparently, that meeting never took place.

## F. Notice of Default and Termination

On August 28, 2015, after several months without any success in communicating with the Robertsons or inspecting the premises, ADQ issued a Notice of Default and Termination, providing Universal until October 30, 2015, to cure defaults under the September 1, 2000, license agreement or else it would terminate effective November 30, 2015. (Beck Decl., Ex. E (dkt. #75-5).) The notice specifically advised Universal that: (1) it was "infringing on ADQ's trademarks by selling non-Dairy Queen® soft serve products using the Dairy Queen® trademark . . . as though such products are authorized Dairy Queen® products"; and (2) it was "violating the Lanham Act by failing to comply with ADQ's system standards." (*Id.* at 4.)

Universal also does not dispute receipt of this notice, but contends that ADQ "did not adequately communicate any intent to conduct what ADQ itself considers to be its standard franchise inspection procedure." (Def.'s Resp. to Pl.'s PFOFs (dkt. #65) ¶ 51.) In response to the notice again urging Universal to permit an inspection (among other demands) Universal advised on October 22, 2015, that "[t]he license agreement does not

grant ADQ the right to inspect the store." (Rotchadl Decl., Ex. F (dkt. #88-6).)

By letter dated November 11, 2015, ADQ again notified Universal that termination was effective November 30, 2015, and then filed the present lawsuit. (Beck Decl., Ex. F (dkt. #75-6).) ADQ subsequently agreed to stay termination of Universal's license until this court decides ADQ's claims. (Beck Decl., Ex. G (dkt. #75-7).)

OPINION

## I. Universal's Tortious Interference Claim

ADQ seeks summary judgment on Universal's counterclaim for tortious interference with its prospective contract with Stephen Partnership on the grounds that: (1) ADQ's conduct was justified and privileged as a matter of law; (2) ADQ did not intend to interfere; and (3) Universal was not a party to the prospective contract. Because the court agrees with ADQ that no reasonable jury could find that its conduct was unjustified or outside its privilege as Stephen Partnership's licensor, the court will grant summary judgment to ADQ.

To prove its counterclaim, Universal must put forth sufficient evidence from which a reasonable jury could find that: (1) it had a contract or a prospective contractual relationship with a third party; (2) ADQ interfered with that relationship; (3) the interference was intentional; and (4) there was a causal connection between the interference and damages. *Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531. To sustain a claim, the interference must also be both without a recognized justification and privilege, *id.*, although the alleged interfering party has the

12

burden to prove that its actions were justified or privileged. *Briesemesiter*, 2006 WI App 140, at ¶ 50.

Here, ADQ argues that as a matter of law its termination of Stephen Partnership and subsequent 2014 lawsuit against the partnership was all based on ADQ's good faith assertion of legal and contractual rights. As described above in the fact section, it is undisputed that ADQ's 2013 notice of default and 2014 complaint alleged Stephen Partnership failed to submit monthly reports and payments as required under their territory agreement and sought a declaratory judgment that the 1982 Food Addendum was properly terminated. Moreover, Stephen Partnership admitted that it breached the 1982 Addendum by failing to pay fees and that it did not cure its default.

In response, Universal argues that ADQ only had the right to terminate the 1982 Addendum, not the 1955 Territory Agreement and 1959 Agreement, and therefore only a part of the lawsuit was privilege or justified. This argument is premised on a convoluted argument about the interplay between the 1955 and 1959 agreements and the 1982 Food Addendum, as well as supposed inconsistencies in ADQ's position as to the enforceability of those agreements. The court need not go down this path of sorting out the specific merits of Universal's view of ADQ's dispute with Stephen Partnership, much less ask a jury to do so. Even crediting Universal's theory that the 1955 and 1959 agreements are separate contracts from the 1982 agreement, the 2014 lawsuit *solely* concerned ADQ's right to terminate the 1982 Food Addendum. As such, Universal's claim that ADQ's lawsuit extended beyond that agreement into terrain "outside its legal rights and without any good faith basis" is bellied by the allegations in that complaint.

Even crediting Universal's theory that the 2014 lawsuit touched on Stephen Partnership's interests under earlier contracts *and* even if the interfering party's position "ultimately is demonstrated to be incorrect, liability should not be imposed on that lone factor." *Briesemeister*, 2006 WI App 140, at ¶ 54; *see also NGL Props, Inc. v. Prostyle, Inc.*, 54 F. Supp. 2d 870, 874 (W.D. Wis. 1998) ("Although plaintiffs may not ultimately prevail on their claims, their suit is simply not the sort of frivolous and malicious action that could ever support, by itself, a claim of tortious interference with prospective business relations."). All of these agreements concerned Stephen Partnership's rights to use the DAIRY QUEEN® trademark. Any uncertainty to the interplay between these agreements does not mean that ADQ lacked a good faith basis to pursue the legal rights it clearly did have. Universal's attempt to draw a bright-line between permissible legal action and impermissible is unavailing, especially given that the justified or privileged defenses cover claims which may not ultimately be successful.

Moreover, it was not the filing of the lawsuit itself that ended Stephen Partnership's negotiations with the Robertsons. As described in the record above, the parties continued their negotiations throughout the course of the 2014 lawsuit. Instead, it was ADQ's arms-length settlement agreement with Stephen Partnership that transferred *all* title, rights and interests in *all* three agreements to ADQ and cut off further negotiations. Whether because of a breakdown in a business relationship or for other reasons, it is not uncommon for a settlement to extend beyond the specific claims at issue in a lawsuit. As part of the settlement, *Stephen Partnership* opted to release *all* of its legal rights and interests. To the extent defendant is taking issue with ADQ agreeing to this resolution, it was entirely

consistent with ADQ's rights generally to control its trademark and license.

In its opposition, Universal also argues that ADQ blocked the sale by refusing to consent to Robertsons' purchase of a majority interest in Stephen Partnership's territory rights. As reflected in the undisputed record, however, the parties never provided ADQ with a proposed transfer of rights for ADQ's consent, and therefore ADQ did not block the sale on this basis. At most, ADQ informed Stephen Partnership that it would need to submit a proposed contract for ADQ's consent, which it would likely deny. This was again within ADQ's express contractual right in the 1982 Food Addendum itself. (Beck Decl., Ex. B (dkt. #47-2) § 12.1 ("Licensee agrees that the interest of Licensee hereunder may not be transferred, assigned or alienated in whole or in part except in strict accordance with the transfer or assignment standards specified in the 'Dairy Queen' franchise agreement identified in Paragraph 1.7 [the 1955 Agreement], and this Agreement may be so transferred only in conjunction with an approved transfer of such 'Dairy Queen' agreement.").) Conceding that ADQ *might* be prohibited from denying consent unreasonably under the doctrine of good faith dealing, no jury would reasonably find that ADQ lacked good business reasons to oppose a proposed sale of the rights it extended to a delinquent licensee to one of its downstream sublicensee. Moreover, given that "there is a strong personal service element" to any dealership relationship, it would have been unfair to foist a sublicensee on ADQ, particularly given the attendant rights and protections extended in Wisconsin under the SFDL. *Nagy v. Customs Hoists, Inc.*, 629 F. Supp. 675, 681-82 (E.D. Wis. 1986).

Even putting aside whether ADQ's right to withhold consent to transfer these rights,

the undisputed facts demonstrate that the requirement of consent did not preclude Stephen Partnership from negotiating the terms of a prospective contract.[9]  Instead, Stephen Partnership's decision not to sell its territory rights was ultimately driven by the subsequent settlement agreement with ADQ.  On the undisputed record, viewing all facts in favor of defendant, a reasonable jury would, therefore, have to find that Stephen Partnership withdrew from negotiations over a transfer of territory rights because of its settlement of the 2014 lawsuit.  Moreover, a reasonable jury would also necessarily find that ADQ was both justified and privileged in asserting its legal and contractual rights by asserting its interest in any transfer of Stephen Partnership's licensing rights or control over those rights, bringing a claim against Stephen Partnership for failing to fulfill its contractual obligations and for ultimately entering into a settlement of that claim that involved Stephen Partnership's release of all rights under those contracts.  As such, the court will grant ADQ's motion for partial summary judgment on Universal's tortious interference claim.

## II. Universal's Laches Defense

"The doctrine of laches is derived from the maxim that those who sleep on their rights lose them."  *Wis. Cheese Grp., Inc. v. V & V Supremo Foods, Inc.*, 537 F. Supp. 2d 994, 1000 (W.D. Wis. 2008) (citing *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002)).  In the trademark infringement context, for laches to apply, the defendant

---

[9]  Similarly, ADQ's termination of the 1955 agreement could not have interfered with the prospective contract because ADQ terminated that agreement in 2013, before Stephen Partnership and the Robertsons had even begun preliminary discussions about the prospective contract.

must demonstrate that

> (1) the plaintiff had knowledge of the defendant's use of an allegedly infringing mark; (2) the plaintiff inexcusably delayed in taking action with respect to the defendant's use; and (3) the defendant would be prejudiced by allowing the plaintiff to assert its rights at this time.

*Id.* (citing *Chattanoga Mfg.*, 301 F.3d at 792-93).

As the Seventh Circuit has previously explained, in the Lanham Act context, "the doctrine of laches plays a more important role than it otherwise might because the Act does not contain a statute of limitations on trademark infringement claims." *Chattanoga Mfg.*, 301 F.3d at 793. In determining its application, courts are directed to look to "analogous state statutes of limitations." *Id.* at 793. "Once relevant state limitations period has run, an allegedly infringing party is entitled to a presumption that the doctrine of laches applies." *Wis. Cheese Grp.*, 537 F. Supp. 2d at 1000.

In this case, defendant identifies § 100.18(11)(b)(3) of the Wisconsin Deceptive Trade Practices Act as an analogous state statute, pointing out that statute imposes a three-year limitations period. Wis. Stat. § 100.18(11)(b)(3). "To rebut the presumption, a party must offer evidence excusing its delay or demonstrating that the party claiming laches has not suffered prejudice." *Wis. Cheese Grp.*, 537 F. Supp. 2d at 1000 (citing *A.C. Aukerman Co. v. Miller Formless Co.*, 693 F.2d 697, 699 (7th Cir. 1982)).

Typically, the doctrine of laches bars recovery of damages, including wrongfully derived profits, during the time prior to filing suit. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 n.3 (7th Cir. 1999). "Upon a showing of infringement, however, the plaintiff may still be entitled to injunctive relief, and to damages and profits for the period

17

subsequent to the filing of suit." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir. 1978) (citing *McLean v. Fleming*, 96 U.S. 245 (1877)). In some cases, however, "the delay may be so prolonged and inexcusable that it would be inequitable to permit the plaintiff to seek injunctive relief as to future activities." *Wis. Cheese Grp.*, 537 F. Supp. 2d at 1005 (quoting *Seven–Up Co. v. O–So–Grape, Co.*, 283 F.2d 103, 106 (7th Cir. 1960)); *see also Hot Wax*, 101 F.3d at 824 n.3 (acknowledging that laches may not bar injunctive relief, but affirming district court's finding that delay was so long that injunctive relief was also barred); *Prestwick Grp., Inc. v. Landmark Studio Ltd.*, No. 14-CV-731-JPS, 2015 WL 2384191, at *10 (E.D. Wis. May 19, 2015) (finding that "it would be inequitable to permit Prestwick to seek injunctive relief on its trade dress claims" in light of 12 year delay in filing suit).

On this issue, the parties' briefs are like ships passing in the night. Universal refuses to even acknowledge the December 2014 transition from a sublicensee of Stephen Partnership to a direct licensee with ADQ, and how that transition might implicate their obligations to comply with brand standards, including the use of the DAIRY QUEEN® trademark. On the other hand, ADQ refuses to acknowledge the fact that ADQ did nothing directly or indirectly to enforce brand standards at least with respect to Universal as a sublicensee before December 2014, instead relying on non-existent, or at least demonstrably lax, enforcement by its territory operator, Stephen Partnership.

Consistent with its position, ADQ contends that it was not "fully" aware of Universal's failure to follow brand standard before early 2015, including using the trademark on unauthorized items, and it cannot be charged with its agent Stephen

Partnership's knowledge. Indeed, ADQ goes further, contending that it had no obligation to know of these violations given that, with respect to sublicensees like Universal, it had the right to rely on territory operators to enforce brand standards before December 2014. But why would this be so? Certainly, in a traditional licensor / licensee role, a trademark owner is "chargeable with information it might have received had due inquiry been made." *Chattanoga Mfg., Inc.*, 301 F.3d at 793 (quoting *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.*, 433 F.2d 99, 103 (7th Cir. 1970)) (internal quotation marks omitted). At the same time, ADQ also argues that Universal is barred from raising such a defense because of unclean hands or licensee estoppel. However, ADQ cannot have it both ways: it cannot both disavow at least constructive knowledge that would arise in a licensor/ licensee relationship *and* rely on that relationship to argue Universal is barred from raising laches as a defense, at least as it concerns the recovery of any past damages.

For its part, Universal contends that laches should also bar any injunctive order requiring compliance with brand standards going forward. In so arguing, Universal simply ignores ADQ's December 2014 transition to a direct licensor or its legitimate interest in seeking compliance with brand standards, specifically limiting the use of the DAIRY QUEEN® trademark to authorized items.[10]

Fundamentally, laches concerns whether it is fair for the plaintiff to assert a legal

---

[10] As part of this argument, Universal focuses on the evidence of noncompliance by other Dairy Queen stores. While this evidence may be material to a naked licensing challenge, *see generally* 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 18:48 (4th ed. 2017), it does not appear material to any of the elements of the laches defense. Similarly, ADQ's evidence of Universal's noncompliance with brand standards is not material to the specific issue raised in the motions for partial summary judgment before the court.

claim.  *See Lingenfelter v. Keystone Consol. Indus., Inc.*, 691 F.2d 339, 340 (7th Cir. 1982) ("Laches is principally a question of the inequity of permitting a claim to be enforced. It is unlike limitation, which is based merely on time. Rather, laches is based upon changes of conditions or relationships involved with the claim.").  While plaintiff's Wisconsin Fair Dealership Law, Wis. Stat. § 135.01 *et seq.*, claim is not before the court on summary judgment, the court cannot help but conclude any determination of fairness for ADQ to assert its trademark rights against Universal turns on that claim.  In other words, since ADQ concedes that it has stepped into the shoes of Stephen Partnership, the WFDL controls as to whether any increased enforcement of ADQ's trademark rights constituted a "substantial change" to the "competitive circumstances" of that dealership, and if so, whether adequate notice and "good cause" exists.  *See* Wis. Stat. § 135.03.  As to the question of good cause in particular, Universal's evidence of noncompliance with brand standards on the part of other licensees, and ADQ's own admission that it treats direct licensees differently than sublicensees when it comes to enforcing brand standards, may be relevant to whether the brand standard requirements are "essential, reasonable and nondiscriminatory."  *See* Wis. Stat. §§ 135.02; *Ziegler Co. v. Rexnord, Inc.*, 147 Wis. 2d 308, 433 N.W.2d 8, 11 (1988).  At the same time, the WFDL directs courts to look at the language of the dealership agreement itself in determining whether a "substantial change in competitive circumstances" required good cause.  *Compare* Wis. Stat. § 135.03 *with* § 135.04; *see also Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 146 Wis.2d 568, 431 N.W.2d 271 (Ct. App. 1988) (addition of another franchisee in non-exclusive agreement does not constitute substantial change in economic circumstances).

Regardless, the court finds that ADQ has failed to put forth sufficient evidence to overcome the presumption of at least constructive knowledge of Universal's noncompliance of brand standards during the period of time its sublicensee Stephen Partnership was responsible for enforcement. *See Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003) (summary judgment on laches defense is appropriate where "the facts necessary for determining whether the defendant suffered material prejudice are not genuinely disputed").[11] At minimum, Universal would, therefore, be unfairly prejudiced by holding it liable for trademark infringement during that period.

As for a claim post-dating that transition, consistent with the notice and good cause requirements under Wis. Stat. §§ 135.03 and 135.04, ADQ cannot assert a trademark infringement claim until at least the date of its notice of a default and the period of time for curing that default -- in other words, until late October 2015. To allow a claim based on earlier alleged infringement would circumvent the protections of the WFDL. Moreover, because genuine issues of material fact preclude the application of the laches defense even after October 2015, the court will reserve on that last part of the motion at this time, but without prejudice to Universal renewing this defense based on the jury's finding as to whether the WFDL bars enforcement altogether, or at least until adequate notice of a "substantial change in competitive circumstances" is provided under Wis. Stat. § 135.04.[12]

---

[11] Based on its submission, ADQ does not appear to seek a finding of liability or damages based on the pre-December 2014 period of time in any event.

[12] Indeed, given this dynamic, the elephant in the room left unaddressed by the parties' summary judgment briefing is the derivative nature of ADQ's remaining trademark infringement claim depending on the outcome of Universal's WFDL claim. In light of this, the parties will hopefully address the interplay between these two claims in structuring the jury instructions and verdict form,

ORDER

IT IS ORDERED that:

1)  Defendant and counter claimant Universal Investment Corporation's motion for partial summary judgment (dkt. #31) is GRANTED IN PART AND RESERVED IN PART.  Accordingly, ADQ is barred from asserting any Lanham Act claim based on alleged infringement pre-dating October 2015.

2)  Plaintiff and counterclaim defendant American Dairy Queen Corporations' motion for partial summary judgment (dkt. #43) is GRANTED on defendant's tortious interference counterclaim.

3)  Plaintiff's motion for leave to file a sur-reply brief in opposition to defendant's motion for summary judgment (dkt. #116) is GRANTED.

Entered this 25th day of August, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

and indeed whether there are really disputed issues of fact for a jury to decide as to notice at all.