IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMERICAN DAIRY QUEEN
CORPORATION,

        Plaintiff and Counter Defendant,

    v.

UNIVERSAL INVESTMENT
CORPORATION,

        Defendant and Counter Claimant.

OPINION AND ORDER

16-cv-323-wmc

This case is set for a jury trial commencing September 25, 2017, on the parties' cross-claims under the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 *et seq.*, plaintiff's claims under the Lanham Act, 15 U.S.C. §§ 1141, 1125(a)(1), and defendant's counterclaims for breach of certain licensing agreements under Iowa law. In advance of the final pretrial conference, the court issues the following opinion and order on the parties' respective motions in limine.

OPINION

I. Plaintiff's Motions in Limine[1]

   A. Motion in limine to exclude evidence relating to other Dairy Queen franchisees (dkt. #128)

In its first motion in limine, plaintiff seeks to exclude evidence of non-compliance

---

[1] Plaintiff ADQ filed two other motions in limine that solely concern defendant's tortious interference counterclaim. (Dkt. ##130, 136.) No doubt because the court granted plaintiff's motion for summary judgment on that claim, defendant chose not to respond to those motions in limine, effectively conceding that the evidence ADQ sought to exclude would no longer be relevant. Accordingly, the court will grant both motions as unopposed.

with its brand standards by approximately 40 other Dairy Queen Stores under Fed. R. Evid. 401, 402 and 403. Specifically, ADQ predicts that Universal will likely attempt to introduce: (1) expert witness testimony by Elizabeth Feagles of 30 stores that she visited in Iowa, Minnesota and Wisconsin that offered off-brand products and menu items; (2) photos taken by Universal's counsel of five other franchisees' non-compliant menu items; (3) testimony from other franchisees about their off-brand offerings; and (4) similar testimony from operational employees who provide support services yet to other franchisees. (Pl.'s Mot. (dkt. #128) 5.)

Fundamentally, ADQ argues that this evidence is not relevant to the WFDL claims because these other franchisees are not "similarly situated" for purposes of determining whether the termination was non-discriminatory (which is in turn one of the relevant factors in assessing whether ADQ acted with good cause under the WFDL).[2] Among other reasons, ADQ contends that these franchisees are not similarly situated to Universal because: (1) they do not have the same "mix of non-compliance . . . or pervasive level of non-compliance"; (2) they do not have the same contract or licensing relationship with ADQ; and (3) some are not located in Wisconsin. (*Id.* at 7.) In addition, ADQ argues that even if this evidence were relevant, it should be excluded under Rule 403 because it will create 40 mini-trials within the trial.

---

[2] The WFDL prohibits the termination or change in competitive circumstances of dealerships, without "good cause." Wis. Stat. § 135.03. In turn, good cause is defined as the "[f]ailure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor," Wis. Stat. § 135.02(4)(a). The statute further demands that the "requirements be non-discriminatory "as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their information."

Regardless of whether such evidence is admissible for purposes of arguing that the termination was discriminatory, Universal points out in response that this evidence is material to whether the requirements were "essential and reasonable" also a part of the statutory definition of "good cause." At minimum, the court agrees with defendant that evidence ADQ tolerates variance from a requirement "may" bear upon whether the requirement is truly reasonable and essential. (Def.'s Opp'n (dkt. #150 2.)

Still, plaintiff's position as to what constitutes a "similarly situated franchisee" for purposes of the jury determining whether ADQ's requirements were non-discriminatory is too narrow. As the Seventh Circuit recently cautioned in a franchise claim brought under Indiana law, in considering whether another franchisee is "similarly situated," "precise equivalence is not required; the parties must be comparable, not clones." *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, No. 16-2788, 2017 WL 3695355, at *4 (7th Cir. Aug. 28, 2017). ADQ may, of course, argue that these stores were more in compliance than Universal or that their respective licensing agreements allowed for greater non-conformity with brand standards (although this latter argument may be a double-edged sword for plaintiff), but that is the jury's to decide, as is the larger determination as to whether Universal's license was terminated for good cause. *See Andy Mohr*, 2017 WL 3695355, at *4 (explaining that "similarly situated" question is one for the jury).

ADQ also raised an interesting, unresolved, as far as the court can tell, question as to whether dealers in other states are "similarly situated" within the meaning of the WFDL. *See generally* Michael A. Bowen *et al.*, *The Wisconsin Fair Dealership Law* § 6.45 (4th ed. 2012). Certainly, *Ralph Gentile, Inc. v. State Div. of Hearing & Appeals*, 2011 WI App 98, ¶

25, 334 Wis. 2d 712, 700 N.W.2d 555, is not dispositive on this issue as it only references the potential for a Commerce Clause concern to affirm the narrow construction by an administrative agency of the underlying statute. *See id.* at ¶ 25 n.10 ("We note, though, that we do not *decide* the constitutional issue; we merely hold that given the potential commerce-clause problems, the Division's interpretation of Wis. Stat. § 218.0116(1)(i)1.a was, in light of the section's clear language, 'reasonable.'"). Moreover, the other case cited by ADQ, *Morley-Murphy Co. v. Zenith Elecs. Corp.*, 142 F.3d 373, 379 (7th Cir. 1998), presented a far broader Commerce Clause concern than that possibly implicated here.

The court, however, need not resolve this issue for purposes of determining whether the evidence is *admissible*. For the reasons explained above, the evidence of non-compliance by franchisees in other states is relevant to plaintiff's claim that the requirements were "reasonable and essential." As such, the only question is whether Universal may rely on this evidence to argue that ADQ's termination of Universal's license was discriminatory. The court, therefore, will reserve on this portion of the motion, and take it up with the parties at the final pretrial conference.

This leaves defendant's challenge under 403, asserting its concern that the evidence "would be overwhelmed by the undue delay, unfair prejudice to ADQ, and the confusion to the jury to decide how ADQ considered each DAIRY QUEEN® franchisee's 'situation.'" (Pl.'s Mot. (dkt. #128) 17.) Though ADQ's description appears exaggerated, the court shares plaintiff's concern that this trial not turn into a series of mini-trials. As such, the court also will take up with the parties at the final pretrial conference how best to present this evidence efficiently and fairly for both sides.

4

## B. Motion in limine to exclude expert testimony of James Devine

Plaintiff seeks to exclude the expert testimony of defendant's damages expert. The admissibility of expert testimony in federal courts is governed principally by Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court functions as a "gatekeeper" regarding expert testimony, determining as a threshold matter whether a party's proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589; *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (the expert testimony must be "not only relevant, but reliable"). Although expert testimony is still "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), it must, therefore, satisfy the following three-part test to be offered at trial:

> (1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702;
>
> (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and

5

(3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). At the same time, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Here, Universal offers Devine's expert opinion in support of its claim for damages for its breach of license agreement claim based on ADQ's termination of the Dairy Queen of Dewitt (Iowa) ("DQD") territory agreement in August 2015.[3] In his two-page report, Devine opines that "a Dairy Queen brand store located in the DeWitt Travel Mart would generate at least $500,000 in gross sales yearly which at 5% would result in a $25,000 yearly sales payment to Universal Investment Corporation." (Devine Rept. (dkt. #135-1) ¶ 4.) Devine explains that the basis of his opinion is his "personal observations of the volume of sales and profitability of the DeWitt Travel Mart and my familiarity through my work with my father with volume of sales for A&W brand stores located at 2 other truck stock convenience store locations at Riverside Iowa and Vinton Iowa." (*Id.* at ¶ 5.) Specifically, Devine notes that those two stores' annual sales volume is $700,000 and $500,000 respectively. (*Id.*) Devine also states that "[b]ased on the higher volume of customer flow . . . , the DeWitt Travel Mart would easily surpass the Riverside and Vinton

---

[3] This begs the question how Universal has a stake in such a claim. Almost one year later, in July 2016, DQD purportedly assigned to Universal all claims, causes of action and damages for termination of its territory and franchise rights. Devine operates the Dewitt Travel Mart, and it has expressed "an interest" in opening a Dairy Queen store in the mart. Since not presented on summary judgment, the court reserves on what standing, ripeness or other equitable or legal defenses might apply to this claim.

Iowa volume of sales," thus implying that his estimate is on the conservative side.

In its *Daubert* motion, ADQ first challenges Devine's testimony on the basis that he lacks the necessary expertise to opine on expected sales, specifically pointing out that he "has no accounting degree, no background in forecasting or financial projections, no prior expert testimony experience, no teaching or speaking engagements related to financial projections or business valuation, no publications regarding financial projections and comparative business analysis, no experience operating a DAIRY QUEEN® restaurant; and no experience forecasting evidence for a new business." (Pl.'s Mot. (dkt. #133) 3.) While an apparently accurate description of Devine's limited professional and educational experience, Devine does not purport to offer his expert based on skill, training or education. Instead, as defendant explains in its response, and consistent with Devine's own representations in his report, the opinion is based on his personal knowledge of (1) sales data from similar fast food stores and (2) customer flow at the DeWitt Travel Mart as compared with other convenience stores or truck stops. Rule 702 requires an expert witness to be qualified "as an expert by knowledge, skill, experience, training, *or* education" Fed. R. Evid. 702 (emphasis added). In light of the limited scope and straight-forward nature of his opinion, Devine need not be an accountant or have experience in financial forecasting or business valuation to offer his opinion. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.").

Second, plaintiff seeks to exclude Devine's testimony because he "did not use any methodology in arriving at his opinion." (Pl.'s Mot. (dkt. #133) 8.) To the contrary,

Devine's methodology is very straight-forward -- he relied on annual sales from what he contends are similar fast-food establishments and his understanding of the customer volume at the DeWitt Travel Mart relative to those other establishments. The fact that the methodology is simple does not render it unreliable. Stated another way, the simple methodology aligns with his narrow, straight-forward opinion. Plaintiff is, of course, free to cross-examine Devine, exposing the limited factual basis for his opinion. *See Daubert*, 509 U.S. at 596. This challenge, however, goes to the weight the jury may assign Devine's opinion, not its admissibility. *See Weir v. Crown Equip. Corp.*, 217 F.3d 453, 465 (7th Cir. 2000) (rejecting *Daubert* motion when challenge went to weight of opinion not its admissibility). Accordingly, the court will deny this motion.[4]

**II. Defendant's Motion in Limine**

For its part, defendant filed a single motion in limine seeking to preclude plaintiff "from arguing or stating that [Universal] failed to timely cure items that were not identified by ADQ as specific cure requirements or that such items support ADQ's assertion that it has 'good cause' to terminate [Universal's] dealership." (Def.'s Mot. (dkt. #123) 1.) Specifically, Universal seeks an order excluding ADQ from arguing that Universal failed to cure by failing to (1) communicate or refusing to talk with ADQ and (2) allow "routine" inspections (as compared to the inspections to insure compliance identified in the notice of default and right to cure letter). (*Id.* at 2-3.)

---

[4] The court is concerned about the fundamental assumption upon which Devine's opinion appears premised - - that the DeWitt Travel Mart would open a DQ store -- but will take up this issue along with the others not with respect to Universal's claims under Iowa law at the final pretrial conference.

In response, plaintiff argues that Universal's refusal to talk with ADQ *was* identified as a basis for default in the August 28 letter. (*See* dkt. #14-7 at 5 ("In this instance, Mr. Robertson refuses to talk to ADQ . . . .").) Whether or not this discrete basis was identified as a basis for default, a number of the other undisputed identified areas of default - - namely, providing reports and setting up inspections - - necessarily implicate a threshold communication requirement. As such, the court agrees with ADQ that it may present evidence and argue that one of the reasons for Universal's default was refusing to communicate.

As for the second area that Universal seeks to exclude -- its purported refusal to allow "routine" inspections -- the court again agrees with ADQ. Contrary to Universal's characterization, the distinction between the compliance inspections identified in the August 28 letter and so-called "routine" inspections is *not* "quite clear[]." (Def.'s Mot. (dkt. #123) 3.) Indeed, defendant concedes that the August 28 letter identified as an area of default "permit[ing] ADQ to inspect the Eau Claire Restaurant to confirm that UIC has complied with its obligations and violations of law." (*Id.* at 2.) As far as the court can tell, the purpose of a "routine" inspection is also to ensure compliance with obligations as a licensee. Defendant is free to argue to the contrary to the jury, but the court sees no basis from barring plaintiff from arguing that Universal was in default for refusing to allow inspections. Accordingly, the court will deny this motion.

ORDER

IT IS ORDERED that:

1) Plaintiff American Dairy Queen Corporation's motion in limine to exclude evidence related to other Dairy Queen franchisees (dkt. #128) is DENIED IN PART AND RESERVED IN PART.

2) Plaintiff's motion in limine to exclude evidence under FRE 408 (dkt. #130) is GRANTED AS UNOPPOSED.

3) Plaintiff's motion in limine to exclude expert testimony and opinions of James Devine (dkt. #133) is DENIED.

4) Plaintiff's motion in limine to exclude damages disclosed after close of discovery (dkt. #136) is GRANTED AS UNOPPOSED.

5) Defendant Universal Investment Corporation's motion in limine regarding argument of non-cure (dkt. #123) is DENIED.

Entered this 15th day of September, 2017.

BY THE COURT:


/s/
_____
WILLIAM M. CONLEY
District Judge